# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of: <br> Information associated with accounts identified as <br> ELLIOTT.FINANCE@GMAIL.COM <br> that is within the possession, custody, or control of <br> Google, LLC | ) <br> ) <br> ) <br> ) <br> ) <br> )   Case No. 2:24-MJ-03496 |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☐ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 2314 | Transportation of Stolen Property |
| 18 U.S.C. §§ 1956 & 1957 | Money Laundering |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

*/s/ Brad Chester*
_____
*Applicant's signature*

Brad Chester, FDA-OIG Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: _____

_____
*Judge's signature*

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

AUSA: Dan Boyle (x12426)

## **ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

This affidavit is made in support of an application for a search warrant for information associated with the following account (the "SUBJECT ACCOUNT"):

      1. ELLIOTT.FINANCE@GMAIL.COM

The SUBJECT ACCOUNT is stored at premises controlled by Google, LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California 94043, regardless of where such information is stored, held, or maintained.

43

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

**I.    SEARCH PROCEDURES**

1.    The warrant will be presented to personnel of Google, LLC (the "PROVIDER"), who will be directed to isolate the information described in Section III below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section III below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section III below to the law enforcement personnel specified below.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records"), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (*see* Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

5.    If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.  **SEARCH PROCEDURES FOR POTENTIALLY PRIVILEGED INFORMATION**

1.   The following procedures will be followed at the time of search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

2.   Law enforcement personnel conducting the investigation ("the Investigation Team") may not search or review information from the SUBJECT ACCOUNT prior to it being given to them by a "Privilege Review Team" consisting of previously designated individual(s) not participating in the investigation of the case.

3.   The Privilege Review Team will review all documents and data disclosed by the PROVIDER to see whether or not a document or data appears to contain or refer to communications between an attorney or to contain the work product of an attorney ("potentially privileged information").

4.   To conduct this review, the Investigation Team will provide the Privilege Review Team with a list of privilege key words to search for on the digital devices, to include specific names or email addresses, and generic words such as "privileged" and "work product."  The Privilege Review Team will conduct an initial review using the privilege key words, and by using search protocols specifically chosen to identify documents or data containing potentially privileged information. Documents or data that are identified by this initial review as not potentially privileged may be given to the Investigation Team.

5.   Documents or data that the initial review identifies as potentially privileged will be reviewed by the Privilege

Review Team member to confirm that they contain potentially privileged information. Documents or data that are determined by this review not to be potentially privileged may be given to the Investigation Team. Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a Privilege Review Team Assistant United States Attorney ("PRTAUSA"). Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Investigation Team. If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies. Documents or data that are the subject of such a finding may be given to the Investigation Team. Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

6.    The Investigation Team will search only the documents and data that the Privilege Review Team provides to the Investigation Team at any step listed above in order to locate documents and data that are within the scope of the search warrant. The Investigation Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant. The Privilege Review Team may also conduct the search for documents

and data within the scope of the search warrant if that is more efficient.

7.    In performing the reviews, both the Privilege Review Team and the Investigation Team may:

a.    search for and attempt to recover deleted, "hidden," or encrypted data;

b.    use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c.    use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

8.    If either the Privilege Review Team or the Investigation Team, while searching the SUBJECT ACCOUNT, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

## III. __INFORMATION TO BE DISCLOSED BY THE PROVIDER__

1.    To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the

5

PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for the SUBJECT ACCOUNT listed in Attachment A:

      a.  All contents of all electronic communications associated with the SUBJECT ACCOUNT, limited to the time period between January 1, 2020 to the present,[1] including:

        i.  All e-mails, drafts, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments;

        ii.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files;

        iii.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken;

---

[1] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

iv.    All other records of communications and messages of any kind made or received by the user, including all private or instant messages or "chats," and specifically including all attachments to any messages in their native formats (for example, if a .zip file was sent to another user, the .zip file shall be provided), history of communications of any kind, video calling history, and pending contact requests;

b.  All other records and information, including:

i.    All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers, or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNT.

ii.    Any information showing the location of any users of the SUBJECT ACCOUNT, including while sending or

receiving a message using the SUBJECT ACCOUNT or accessing or logged into the SUBJECT ACCOUNT.

**IV.  INFORMATION TO BE SEIZED BY THE GOVERNMENT**

1.  For the SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.  All information described above in Section III that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 2314 (Transportation of Stolen Property); and 18 U.S.C. §§ 1956 & 1957 (Money Laundering), or a conspiracy to commit the same (collectively, the "Subject Offenses"), namely:

i.  Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.  E-mail, messages, drafts, chats, and/or other communications, including any associated attachments, documents, audio recordings, pictures, video recordings, or still captured images, relating to the following:

(I)  Innova Medical Group;

(II)  Pasaca Capital;

(III)  Charles Huang;

(IV)  Clay Manley;

(V)  Kimberly ("Kim") Thonger;

(VI)  Charles Palmer;

(VII)  Peter Santeusanio;

(VIII)  Fastdew LLC;

8

(IX)    Esurient LLC;

(X)     Nano Holdings;

(XI)    Nano Liquitec;

(XII)   Disruptive Nanotechnology; and

(XIII)  Purported commissions payments relating to sales by Innova Medical Group to the United Kingdom's Department of Health and Social Care.

## V.   **PROVIDER PROCEDURES**

1.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section III within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

        Special Agent Brad Chester
        Food & Drug Administration
        201 Avenida Fabricante #201
        San Clemente, CA 92672
        Telephone:  909.580.7450
        Facsimile:  949.940.4637
        E-mail:  Brad.Chester@fda.hhs.gov

2.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

3.   IT IS FURTHER ORDERED, pursuant to 18 U.S.C § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of the account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one

year from the date this warrant is signed by the magistrate
judge or such later date as may be set by the Court upon
application for an extension by the United States.  Upon
expiration of this order, at least ten business days prior to
disclosing the existence of the warrant, the PROVIDER shall
notify the agent identified in paragraph V.1 above of its intent
to so notify.

**AFFIDAVIT**

I, Brad Chester, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Food and Drug Administration ("FDA"), Office of Criminal Investigation ("OCI") in Los Angeles, California. I have been in my current position since June 19, 2022. Prior to joining the FDA, from January 2017 to June 2022, I worked as an SA with the United States Department of State, Diplomatic Security Service ("DSS"). I was assigned to Los Angeles, CA (August 2017-July 2019); Algiers, Algeria (October 2019-August 2021); and Washington, D.C. (October 2019-June 2022). My caseload included the investigation of criminal violations of the laws governing the issuance of passports, visas, and other travel documents utilized to transit international borders, counterintelligence investigations, investigations of security threats, and I served as a U.S. Marshals Task Force Officer. I received training from the Federal Law Enforcement Training Center's ("FLETC") Criminal Investigator Training Program, as well as the U.S. Department of State's Special Agent Course. From March 2008 to August 2012, I worked as a police officer with the Los Angeles Police Department, where I performed patrol duties, worked on the Operations West Bureau Violent Crime Task Force, and the Southeast Division Gang Unit. From August 2012 to January 2017, I worked as a police officer with the Kansas City Police Department, where I performed patrol duties. As a Special Agent

1

for FDA-OCI, I am responsible for investigating violations of the Federal Food, Drug, and Cosmetic Act, Title 21 U.S.C. §§ 301-399i (the "FDCA"), as well as related Title 18 offenses. I am currently investigating Innova Medical Group, Inc. and numerous related individuals and entities for potential violations of federal law, including conspiracy, introduction into interstate commerce of adulterated medical devices, false statements to the FDA, mail and wire fraud, and obstruction of agency proceedings.

2.    I make this affidavit in support of an application for a warrant for information that is stored at premises controlled by Google, LLC (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, associated with the account identified as ELLIOTT.FINANCE@GMAIL.COM (the "SUBJECT ACCOUNT").[1]

3.    The information to be searched is described in Attachment A.  This affidavit is made in support of an

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

application for a warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER
to disclose to the government copies of the information
(including the content of communications) described in
Section III of Attachment B. Upon receipt of the information
described in Section III of Attachment B, law enforcement agents
and/or individuals assisting law enforcement and acting at their
direction will review that information to locate the items
described in Section IV of Attachment B. Attachments A and B are
incorporated herein by reference.

4.    As described more fully below, I respectfully submit
there is probable cause to believe that the information
associated with the SUBJECT ACCOUNT constitutes evidence,
contraband, fruits, or instrumentalities of criminal violations
of 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 2314
(Transportation of Stolen Property); and 18 U.S.C. §§ 1956 &
1957 (Money Laundering), or a conspiracy to commit the same
(collectively, the "Subject Offenses").

---

[2] The requested warrant calls for both records containing
content (see Attachment B paragraph II.10.a.) as well as
subscriber records and other records and information that do not
contain content (see Attachment B paragraph II.10.b.). To obtain
the basic subscriber information, which does not contain
content, the government needs only a subpoena. See
18 U.S.C. § 2703(c)(1), (c)(2). To obtain additional records and
other information--but not content--pertaining to subscribers of
an electronic communications service or remote computing
service, the government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in
order to obtain an order pursuant to 18 U.S.C. § 2703(d).

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.    SUMMARY OF PROBABLE CAUSE

6.    Innova Medical Group ("IMG") was a medical device supply company based in Pasadena, California which marketed, sold, and distributed rapid antigen tests intended for the detection of the COVID-19 disease during the global pandemic. IMG successfully sold more than $5 billion in such tests to the government of the United Kingdom.

7.    During this period, two of IMG's officers, Daniel ELLIOTT and Robert KASPRZAK, entered a kickback scheme with one of IMG's external sales representatives to divert commissions from IMG's sales of such tests in order to benefit ELLIOTT and KASPRZAK personally, in violation of their employment agreements and through false statements to IMG's ultimate beneficial owner.

8.    In total, ELLIOTT and KASPRZAK improperly obtained multiple payments totaling approximately $106 million, to which they were not entitled and in violation of their duties as IMG officers.

4

9.    During the period of this scheme ELLIOTT used the SUBJECT ACCOUNT to communicate with KASPRZAK and with other third parties.

10.    The government now seeks a warrant to seize the contents of the SUBJECT ACCOUNT in order to investigate the Subject Offenses.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

11.    Based on my conversations with other law enforcement officers and investigators who participated in this investigation, my review of communications and other electronic records, and my own observations and knowledge of the investigation, I know the following:

**A.    Background on IMG and Pasaca Capital**

12.    I and other agents of FDA-OCI, working with the Internal Revenue Service – Criminal Investigations ("IRS-CI"), overseen by prosecutors from the United States Attorney's Office in this judicial district and the Department of Justice Consumer Protection Branch (collectively, the "Prosecution Team") have been investigating IMG and certain of its current and former officers and employees.

13.    Based on my knowledge of this investigation, I am aware of the following:

a.    IMG is a corporation formed in or about March 2020 under the laws of the State of Nevada, with its principal place of business located in Pasadena, California, within the Central District of California.

b.    IMG is a wholly-owned subsidiary of Pasaca Capital, Inc. ("Pasaca"), which is a private equity firm and a corporation organized under the laws of Nevada, with a principal place of business in Pasadena, California, within the Central District of California.

c.    Pasaca was founded and majority owned by Charles Huang ("Huang"). Huang is a resident of Los Angeles County.

d.    IMG was engaged in the business of marketing, selling, and distributing medical devices.

e.    IMG's medical devices included a SARS-CoV-2 Antigen Rapid Qualitative Test (the "Innova Antigen Test"), a lateral flow immunochromatographic assay intended for the detection of severe acute respiratory syndrome coronavirus 2 ("SARS-CoV-2"), the coronavirus that causes the coronavirus disease 2019 ("COVID-19") in humans.

f.    Daniel James Elliott ("ELLIOTT") is a resident of Los Angeles County, and was the Chief Executive Officer of IMG between 2019 and July of 2022. In that role, ELLIOTT was the highest-ranking executive of the company and responsible for the operation of IMG, including providing resources, hiring, and firing employees, and distribution of the Innova Antigen Test.

g.    Robert Kasprzak ("KASPRZAK") is a resident of the State of Texas and an attorney licensed to practice law in the States of California and Texas. In 2020, KASPRZAK was the Chief Legal Officer of IMG and, beginning in July 2022, succeeded ELLIOTT as the Chief Executive Officer of IMG.

6

h.      Clay Windsor Manley, II ("MANLEY"), is a resident of the State of Maine and served as a "Business Development Coordinator" for IMG. MANLEY was the owner of Nano Liquitec, LLC ("NLT"), a limited liability company organized under the laws of Florida.

**B.      Between 2020 and 2022, IMG Successfully Bid on Contracts for the Sale of Innova Antigen Test to the United Kingdom**

14.   I, and/or other members of the Prosecution Team that I have spoken with, have reviewed publicly-available contract data disclosed by the government of the United Kingdom (the "UK Contract Data").[3] Based on this review, I am aware that between 2020 and 2022, IMG was awarded at least 10 contracts with the United Kingdom's Department of Health and Social Care (the "UK DHSC") for the sale of units of the Innova Antigen Test, worth at least GBP 4,110,802,443.[4]

**C.      Between 2020 and 2022, IMG Received Billions of Dollars from the UK DHSC for Sales of the Innova Antigen Test**

15.   I, and/or other members of the Prosecution Team that I have spoken with, have reviewed a spreadsheet produced by IMG in native form, bearing bates-number IMGPC_00000025 (the "IMG Transaction Report"). Based on this review, I am aware of the following:

---

[3] I reviewed this data on or about June 6, 2024, which was publicly-available at https://www.contractsfinder.service.gov.uk/.

[4] While the value of these contact in U.S. Dollars fluctuated with the prevailing exchange rates, as of June 6, 2024 this amount would be roughly equivalent to $5,238,046,134.91.

a.    The IMG Transaction Report has multiple tabs. A tab titled "UK DHSC," has a heading that reads "INNOVA MEDICAL GROUP, INC., Transaction Report, January 2020 - September 2022" and collects a series of entries identified as "deposit" or "payment," arranged by date. Each of these entries identifies the counterparty as either "UK DHSC" or "UK Health Security Agency."[5] Each entry includes an amount and a memo or description. This tab of the IMG Transaction Report reflects a total of amount deposited or paid by the UK DHSC or UK Health Security Agency to IMG of $5,971,456,646, after deducing value added tax.

b.    The IMG Transaction Report has a separate tab titled "commission." This tab reflects identified expenses or payments, as well as an amount and a memo or description for each identified expense. Four different parties are identified in this tab: (1) MANLEY, (2) Disruptive Nanotechnology Ltd ("DNT"), (3) Nano Holdings, LLC ("Nano Holdings"), and (4) Peter Santeusanio ("P.S."). This tab of the IMG Transaction Report reflects payments to Nano Holdings totaling $106,184,673.

**D.    Pasaca Entered Commission Agreements with Sales Consultants to Market and Sell the Innova Antigen Test**

16.    I, and/or other members of the Prosecution Team that I have spoken with, have reviewed commission agreements entered

---

[5] I know based on public sources that certain functions of the UK DHSC were reorganized as the "UK Health Security Agency" in or about April of 2021.

into between Pasaca and other entities. Based on this review, I am aware of the following:

      a.   On or about March 26, 2020, Pasaca entered into a "Commission Agreement" with NLT. This agreement was signed by Huang on behalf of Pasaca, and MANLEY on behalf of NLT. Under the terms of this agreement, Pasaca was obligated to pay NLT the lesser of $4.00 or 20% of the price Pasaca sold Innova Antigen Tests to any buyer introduced by NLT.

      b.   On or about August 25, 2020, Pasaca entered into a "Commission Agreement" with DNT. This agreement was signed by Huang on behalf of Pasaca and "Kim Thonger" on behalf of DNT. Under the terms of this agreement, Pasaca was obligated to pay DNT 10% of the price Pasaca sold Innova Antigen Tests to any buyer introduced by NLT.

      c.   On or about September 15, 2020, Pasaca entered into a "Second Amendment to Commission Agreement"[6] with NLT, which stated that, for any Innova Antigen Tests to the government of the United Kingdom, NLT would receive 10% of the purchase price on the first 18,000,000 Innova Antigen Tests sold, and 3% on any further sales.

**E.   Huang has Alleged in a Sworn Statement that ELLIOTT and KASPRZAK Defrauded Him**

    17.  I and/or members of the Prosecution Team that I have spoken with have reviewed a sworn statement signed by Huang, and

---

[6] I have also reviewed a First Amendment to Commission Agreement between Pasaca and NLT which amended the initial Pasaca-NLT agreement in terms not relevant to this application.

dated February 1, 2023 (the "Huang Statement").[7] Based on my review of the Huang Statement I am aware of the following:

a.    Huang is the founder and majority shareholder in Pasaca, personally and through family members and entities he controls.

b.    ELLIOTT began working for Pasaca in 2019, and left the company in or about June 2022. During this period of employment, ELLIOTT was paid $1,807,897.51 in total pre-tax employee compensation, a $110,000 director's fee, and was given a $110,715 Patek Philippe watch as a gift.

c.    KASPRZAK was hired as in-house counsel for Pasaca and related companies in or about February 2020, based on ELLIOTT's recommendation. KASPRZAK was terminated in or about September 2022. During this period of employment, KASPRZAK was paid $1,481,012.99 in total pre-tax employee compensation, a $110,000 director's fee, a $15 million special director's bonus, and was given a $163,705 Breguet watch as a gift.

d.    As part of their employment, ELLIOTT and KASPRZAK each had the opportunity to purchase shares in Pasaca, and each ultimately purchased 750,000 shares, such that each ultimately held an 11% stake in Pasaca. Based on this equity, which was

---

[7] I understand that through counsel ELLIOTT and KASPRZAK have alleged in various forms that Huang has declining mental capacity or is otherwise mentally unfit, and thus the Huang Statement (or any similar statement) is not reliable. I have not interviewed Huang – nor have I interviewed ELLIOTT or KASPRZAK – so I have not reached any personal conclusion as to Huang's current mental state. However, as detailed herein, the Huang Statement is corroborated by other sources of evidence, so I currently have no reason to doubt Huang's mental capacity during the time period the Huang Statement was signed.

acquired at different times, Pasaca paid ELLIOTT and KASPRZAK dividends totaling $63,133,236 and $60,633,236, respectively.

e.    During their employment, ELLIOTT and KASPRZAK were informed that Pasaca employees would be compensated through salaries, bonuses, and opportunities to purchase Pasaca shares, but were not eligible to earn sales commissions like the third party sales agents.

f.    Between October 2020 and September 2022, Huang directed the transfer of over $106 million to Nano Holdings. Huang did so based on ELLIOTT and KASPRZAK's representations that Nano Holdings was a vehicle to pay commissions owed to MANLEY and DNT under the above-described commission agreements. Huang understood MANLEY and DNT to be third party sales agents who were receiving commissions for IMG's sale of Innova Antigen Tests to the UK DHSC under the terms of preexisting commission agreements.

g.    In or about April of 2022, Huang decided to separate ELLIOTT from Pasaca.

h.    Huang consulted with KASPRZAK regarding ELLIOTT's possible separation. During an in person meeting between Huang and KASPRZAK which took place between April and July of 2022, KASPRZAK stated to Huang that MANLEY had asked ELLIOTT and KASPRZAK to serve as directors of Nano Holdings. This conversation confirmed Huang's belief that Nano Holdings was MANLEY's entity.

i.    In another meeting with KASPRZAK on or about July 19, 2022, KASPRZAK told Huang that ELLIOTT and KASPRZAK had

11

stakes in Nano Holdings. Huang understood KASPRZAK to mean that KASPRZAK and ELLIOTT had obtained stakes in MANLEY's company to use as a vehicle for future investments with MANLEY.

   j. On or about September 7, 2022, Huang and two of his associates met with MANLEY. During that meeting, MANLEY informed Huang that MANLEY had no ownership in Nano Holdings, and that ELLIOTT and KASPRZAK had been the recipients of all payments directed to Nano Holdings.

   k. Following this September 7, 2022 meeting, Huang terminated KASPRZAK and engaged counsel to begin an investigation.

**F. Text Messages Between ELLIOTT and MANLEY Corroborate Huang's Allegations and Show Discussions of a Kickback Scheme as Early as May of 2020**

  18. I and/or members of the Prosecution Team that I have spoken with have reviewed text messages between MANLEY and ELLIOTT. Based on my review of these account records, I am aware of the following:

   a. On or about May 18, 2020, MANLEY sent a text message to ELLIOTT, which included the following exchange:

MANLEY: This is my segue to the next piece: our personal arrangement with you. *I like the way we have a private arrangement and would like to build upon it to help line both of our personal cash portfolios.* I'm thinking in order to simplify, I either approach [P.S.] and take him down to 25% and offer you the same 25%, or we keep him in

the dark and handle our split behind the scenes. You and
I can discuss this, but what I do want to offer is that
you make it a point to get DNLT (Deutsche Nano LiquiTec
GmbH) in the revenue for every single seed that grows
fruit from the network we have and will introduce to you.
Case in point: Quantum Materials/ World Nano. ***If you make
it your project to fight for as much of a percentage for
us to be paid by Pasaca for any business generated with
our seeds, there is more for us to live on and share with
you.*** That's what I need you to know, because I see us
working together for a long time if you'll have us, but
at this moment, we are sucking wind and I need to lock
down as much opportunity as I can—and you are the key.
Thank you for considering. Let's discuss when you have
time. …

ELLIOTT: Very helpful. I appreciate your candor. I will do
something on this. The timing of this message is good as
well.

MANLEY: Thank you for understanding. That could have gone one of
two ways. Luckily, my read of your character said to
simply share our perspective with you.

(emphasis added).


19.  Based on my training and experience and my knowledge
of the investigation, I believe that the above-quoted portions
of these messages corroborate the Huang Statement.

**G.    Text Messages and emails Between ELLIOTT, KASPRZAK, and Huang also Corroborate Huang's Allegations and Show that Huang Believed Nano Holdings to be Controlled by MANLEY**

20.    I and/or members of the Prosecution Team that I have spoken with have reviewed text messages[8] and emails between ELLIOTT, KASPRZAK, and Huang. Based on my review of these account records, I am aware of the following:

a.    On or about October 8, 2020, KASPRZAK sent an email to Huang, stating "Dear Charles Please see attached received from Clay [MANLEY]" and attaching a document titled "NLT Disbursement Instructions."

i.    The attached document is a letter, dated October 8, 2020, addressed to Huang, signed by MANLEY, and titled "Commission Agreement Distribution of Funds" (the "October 8 Letter").

ii.    The October 8 Letter states as follows: "In connection with the commission agreement between our companies dated March 26, 2020, as most recently amended on September 15, 2020, I understand that commissions have or will soon become due and payable to us. We ask that you please distribute the funds as follows: $8,694,000 to Clay Manley; $3,726,000 to Nano Holdings, LLC; and $1,380,000 to Peter Santeusanio. I have provided the wire instructions for each to you herewith."

---

[8] These include messages sent via apps such as Whatsapp and WeChat, and based on my training and experience, I know that these are smartphone applications that allow users to exchange text message, calls, and documents.

iii. Earlier on the same day, KASPRZAK had emailed an unsigned draft of the October 8 Letter to MANLEY, and a signed version was emailed back to KASPRZAK that day via the electronic document signature platform DocuSign.

b. On or about October 9, 2020, KASPRZAK sent an email to ELLIOTT titled "Nano Holdings Commission Agreement," which ELLIOTT forwarded to Huang three days later on October 12, 2020, stating "Charles, For your signature." The underlying email (forwarded from ELLIOTT to Huang) attached a purported "Commission Agreement" between IMG and Nano Holdings, and KASPRZAK stated in the cover email "Dear Dan, In connection with the revised agreements with Clay and Kim, I understand we will owe a 2% commission to Nano Holdings, LLC. Attached please find the commission agreement which, together with the revised agreements for Clay and Kim respectively, should cover the full agreed upon commission."

c. On or about October 13, 2020, ELLIOTT messaged Huang, copying KASPRZAK, stating "Charles. These are the wires for the 18 million unit order. This equal to 20% total. Which is 10% to Kim's company **and 10% to Clay's company** (**Clay has his split to 3 accounts**). Going forward it is 8% total as you know. So the numbers are much lower going forward." (emphasis added).

d. On or about October 13, 2020, Huang sent a message to KASPRZAK, that read as follows: "Can you send me the wire transfer information for Clay's three recipients and also Kim?"

     e.   The next day, on October 14, 2020, ELLIOTT messaged Huang, stating "We have confirmation from Kim that his wire transfer arrived. Clay confirmed. All wires received."

     f.   On or about November 30, 2020, Huang sent a message to KASPRZAK, that read as follows: "I am going to wire commission to Kim and Clay. Can you give me their bank info? I prefer to send just one recipient for Clay's commission instead of 3, if that is fine for him? … accumulated payment from the UK on extension contract: $438,710,299. So each of Kim and Clay will receive $17,550,012 commission. $35.1 million total commission for Kim and Clay to split." KASPRZAK responded "Ok ty. Kim Thonger = $13,161,309 Clay Manley = $11,845,178 Peter S. = $1,316,131 Nano Holdings = $8,774,206."

21.   Based on my training and experience and my knowledge of the investigation, I believe that the above-quoted portions of these messages corroborate the Huang Statement allegation that Huang did not know that ELLIOTT and KASPRZAK operated or were profiting from Nano Holdings.

**H.   Text Messages and Emails Between ELLIOTT and KASPRZAK Corroborate Huang's Allegations, and Show ELLIOTT and KASPRZAK's Concern that Huang Would Discover Their Interest in Nano Holdings**

22.   I and/or members of the Prosecution Team that I have spoken with have reviewed text messages[9] between ELLIOTT and

---

[9] These include messages sent via Whatsapp, and based on my training and experience, I know that Whatsapp is a smartphone application that allows users to exchange text message, calls, and documents.

KASPRZAK. Based on my review of these account records, I am aware of the following:

a.    On or about October 8, 2020, KASPRZAK sent a message to ELLIOTT stating as follows: "Idea: if Ted[10] can't get us up in UK, how about using our First Republic Wyoming [sic] company, **have Charles send 2% there and tell him Clay and Kim are sharing that money in the US account**. That might actually be the right answer even if ted can get us up in UK." (emphasis added). ELLIOTT responded "This is what we should do anyway. Would be easier than doing a UK company."

b.    On or about May 9, 2021, ELLIOTT messaged KASPRZAK regarding a new account created at FRB. In the conversation, ELLIOTT stated as follows: "Charles has been wiring me at Citibank. So if he asks why the commission account is at First Republic and my trust accounts are now at First Republic, we just need to say everyone met the First Republic people through Ted. But there is no linkage. Agree?" KASPRZAK responded "Agree. The old commish payment went to fr anyway. So won't be a total surprise." ELLIOTT responded "Ok. Just that my dividend always went to Citibank. Now he will see it go to FR. In case he asks. I learned to [sic] FR through Ted perhaps."

23.   Based on my training and experience and my knowledge of the investigation, I believe that the above-quoted portions

---

[10] "Ted" appears to be a reference to Ted Maloney, a lawyer who provided legal services to ELLIOTT personally, and for a brief period, to Pasaca. Based on my knowledge of the investigation, I know that Maloney was the person who incorporated Nano Holdings.

of these messages corroborate the Huang Statement allegation that Huang did not know that ELLIOTT and KASPRZAK operated or were profiting from Nano Holdings.

**I.    Emails Sent by ELLIOTT Corroborate Huang's Allegations**

24.    I and/or members of the Prosecution Team that I have spoken with have reviewed emails sent by ELLIOTT to Kim Thonger and Charlie Palmer. Based on my review of these records, I am aware of the following:

a.    On or about May 17, 2021, ELLIOTT emailed Kim Thonger and Charlie Palmer, the principles of DNT, during a dispute over sales commissions. In this email, ELLIOTT stated to Palmer and Thonger as follows: "I have sent over the adjusted agreement as it is not only very fair, it is literally what we can do. … For sure, you both have made far more 'personal' wealth than any of us at IMG in the corporate world."

i.    Based on my review of the IMG Transaction Report, this statement was substantially untrue, and as of the date of that email, DNT had received roughly the same amount than ELLIOTT and KASPRZAK had personally received through Nano Holdings – approximately $53.7 million for DNT versus approximately $51 million for Nano Holdings.

**J.    Call Notes and Emails from MANLEY Corroborate Huang's Allegations**

25.    I and/or members of the Prosecution Team that I have spoken with have reviewed a printout of undated personal notes kept by MANLEY and produced by NLT recounting April 2022 calls between KASPRZAK and MANLEY (the "Call Notes"). I have also

reviewed a July 18, 2022 email from MANLEY to P.S., titled "V2 Draft Response to Bobby," which include the substance of the Call Notes (the "July 18 Email"). Based on my review of these records, I am aware of the following:

a.    The July 18 Email appears to be a discussion between MANLEY and P.S. of talking points for a future discussion with KASPRZAK after an April 2022 call between MANLEY and KASPRZAK, as reflected in the Call Notes.

b.    In the July 18 Email, MANLEY stated as follows: "the very subpoena I received on 7/7 was not intended for Clay Manley, but rather, the Custodian of Records for Nano Holdings, which according to the strategically labeled files in the Pasaca/IMG database, Clay Manley is named as that Custodian of Records. It was as much of a clerical error as you telling me to sign a dispersement [sic] letter you wrote on my behalf to Charles on 10/7/2020,[11] telling me to sign it, even though I told you 'I don't know what Nano Holdings is', to which you said 'same owners as Paladin.'[12] *The naming of Nano Holdings to appear as part of my Nano LiquiTec group was a strategy, not a clerical error*." (emphasis added).

---

[11] This appears to be a reference to the October 8 Letter that was presented to Huang, as detailed above. See Paragraph 20, supra.

[12] Based on my knowledge of the investigation, I am aware that in or about September 2020, Paladin Purchasing and Supply, LLC, a company owned and operated for the benefit of ELLIOTT and KASPRZAK, entered into a "consulting agreement" with NLT to receive 27% of commissions paid to NLT for certain sales of the Innova Antigen Test.  This would equate to 2.7% of the sales price for the first 18 million Antigen Tests sold to the U.K. and .81% of the remaining sales to the U.K.

26.   Based on my training and experience and my knowledge of the investigation, I believe that the above-quoted portions of the Call Notes corroborate the Huang Statement allegation that Huang did not know that ELLIOTT and KASPRZAK operated or were profiting from Nano Holdings.

## K.   A Presentation Prepared by MANLEY Corroborates Huang's Allegations

27.   I and/or members of the Prosecution Team that I have spoken with have reviewed Whatsapp messages between MANLEY and an individual identified as Rich Hornstrom. Based on my review of these records, I am aware of the following:

a.   On or about May 19, 2022, MANLEY sent a message to Hornstrom attaching a Microsoft PowerPoint file titled "Fair and Equitable 2022 V2" (the "Presentation").[13]

b.   MANLEY stated that the Presentation was "about 80% done" and that he "didn't want to send via email."

c.   The Presentation is a 26-slide Microsoft Microsoft PowerPoint file, including notes and comments.

d.   The Presentation begins with an "Opening Statement" which states as follows: "If Clay, Dan, and Bobby are to finally behave as 3 friends who are looking out for each other and not just Clay looking out for Dan and Bobby by keeping quiet while the vehicle Clay and Dan created together was used

_____

[13] MANLEY also wrote "PRIVELEGED AND CONFIDENTIAL" (sic) in this message, but based on my review of public sources, Hornstrom is a business adviser and consultant, and I could find no record of Hornstrom being a lawyer. Neither is the Presentation itself marked privileged.

by Nano Holdings SOLELY, (without Clay) to pocket a far greater percentage of the commissions Clay agreed to share with Dan, then they will work together to find a swift resolution that does NOT reach the alternative path suggested by Dan. That alternate path is, "*if you feel you are owed more than the $17 million that would match what was paid to DNT, you can take it up with Charles.*" If that discussion with Charles were to become adversarial, a lawsuit would bring up the dreaded word of "discovery", where it is understood that this would turn the case from being labelled as a Civil Breach of Contract into a case about Fraud. No one wants that, especially those in Nano Holdings" (emphasis in original).

      e.   The fifth page of the Presentation, under the heading "summary," includes a bullet point stating as follows: "Brunswick Airport meeting 10/7/2021. First-time revelations from Dan to Clay. $30 million of Clay's money invested on his behalf, without his consent, to TBI and Dr. Khalid. Ted Maloney is Nano Holdings. ***Biggest smoking gun of all: Dan told Clay 'Bobby and I had to go to Charles to tell him Clay asked us to sit on the board of Nano Holdings.'*** If nothing else is discussed from all of the attached data, this point is reason enough to finally become transparent about the operation, unless you want to continue to insult Clay's intelligence, which doesn't bode well for respectfully-spirited negotiations." (emphasis added).

      f.   The tenth page of the Presentation includes the following statement: "In 2017, my former stepfather(CPA), was sentenced to 8 years in federal prison for masterminding and

executing a scheme to methodically and discreetly siphon funds from his employer, Strickland Trading, Inc., which he had been doing for 15 years. After his shocking conviction, I recalled a few transactions I had witnessed where he wrote checks from an account called Strickland Trading, LLC. ***It was this memory that sprung to mind on 10/8/2020, when I was told to sign my name to Charles Huang, directing him to wire funds into an account that sounded like my own company***." (emphasis added).

g.   The twelfth page of the Presentation includes a series of bullet points purporting to recite prior discussions, and then the following statement: "The purpose of pointing out these commitments made by Dan to Clay, is to show what the expectations were from Clay's side, which led to him following Bobby's directive to sign a pre-written message to Charles Huang, authorizing PCI/IMG to pay Nano Holdings, directly, thereby establishing a visual link in Charles' mind between Nano LiquiTec, LLC and Nano Holdings, LLC. Once this link was established, the "vessel" by which Nano Holdings used to collect commissions paid by PCI was *activated and substantiated*." (emphasis in original).

h.   The nineteenth page of the Presentation is titled "Notes from 10/7/2021 Brunswick Airport Meeting #1 between Dan and Clay" and "First-time revelations from Dan to Clay." This page of the Presentation includes the following: "Dan told Clay that he and Bobby had to go to Charles and tell him that Clay had asked Dan and Bobby to sit on the board of Nano Holdings, LLC, *even though Clay did not make such a request, nor does he*

*have any authority to make such a request and is not a part of Nano Holdings, LLC."* (emphasis in original).

      i.  The final page of the Presentation includes a "Closing Statement" which includes a bullet point stating as follows: "Counsel has indicated that if this were to turn into a lawsuit against PCI/IMG, discovery would quickly turn the case from a Civil Breach of Contract to a Fraud case, which no one wants."

28.  Based on my training and experience and my knowledge of the investigation, I believe that the above-quoted portions of the Presentation corroborate the Huang Statement allegation that Huang did not know that ELLIOTT and KASPRZAK operated or were profiting from Nano Holdings.

**L.**  **A Recording made by MANLEY Corroborates Huang's Allegations and Shows MANLEY Admitting that KASPRZAK Asked Him To Lie About Nano Holdings**

29.  I and/or members of the Prosecution Team that I have spoken with have reviewed a transcript of a recording made by MANLEY on or about September 9, 2022 (the "Recording").[14] Based on my review of these records, I am aware of the following[15]:

---

[14] Both this transcript and a copy of the original recording were produced to the Prosecution Team by counsel to Huang, who stated that MANLEY recorded this conversation without any other party, including Huang's, consent.

[15] While I have not compared the entire underlying recording to the transcript due to its length, I have compared to quote portions and confirmed the accuracy of the transcript as to all quoted language.

a.    The Recording includes four speakers, MANLEY, Huang, "Blair," and "Lina."[16]

b.    After making introductions, MANLEY states to Huang: "thought it'd be a good idea to come and talk to you and, and share some stuff. And, it's really two reasons that I asked for this meeting. The first was to let you know what I think has happened and number two to ask for your help and kind of fix it. Cause I think, and um, what'd you hear without your help, I'm, I'm in a tough spot. Um. So, ya know, it's a pretty amazing story. And, it, it hurts me to tell you this but it's also, it's been hurting me to live it. Um. It's been increasingly clear to me that Daniel and Bobby formed an organization called Nano Holdings… For the purpose of looking like it's my company, and I gotta live with that."

c.    Huang responds "From the very beginning, Dan said this is your company and, Dan give me wire transfer information, and uh, all for this company, and the uh, pay according to, how much pay to Nano Holdings, how much pay to Peter, how much pay to [DNT]."

d.    Lina then asks "Question, so Nano Holding, are you a part of the shareholder?" and MANLEY responds "I'm not a part of Nano Holdings. I've never been." And goes on to state "it happened because Daniel approached me and made it clear to me that he wanted a piece of my commission. Okay? And, and, and

---

[16] Based on my knowledge of the investigation and the Huang Statement, I understand Blair and Lina to be references to Blair Hu and Lina Tullberg, who are current or former employees of Pasaca.

the way he did it, it wasn't a way like it was a gun to my head but it was, it was brought to me in a very subtle way that said when you're really making this much."

e.    The Recording then includes the following exchange:

Clay:    Let me make it easy. Well, so I realized what he was asking for so I said let me call you back, so I talked to Julie, and I said, "Babe, I think we need to bring Daniel into our commissions." And she said, "What are you talking about?" I said, "Well, he made it clear to me that things would probably go a lot smoother (inaudible)."

Charles:    You should have spoken to me at that point.

Clay:    ***Well, he asked me to keep it quiet, okay. And, I, so he said, "This is just between us, nobody needs to know what our personal business is, I've got a company I'll run this through,"*** and I'm thinking, "Well, he can take this away from me and I can't take control of what – [inaudible] I can't go over to UK and say you guys can't [inaudible] I gotta trust that he's gonna make sure that we get paid for what we've done. So I'm, I'm, I'm like, I can't fight him. Yes, in hindsight I wish I would have come to you, um, but I just, I'm listening to him, I'm, he's my only –

Lina:    Connection, yeah.

(emphasis added).

25

f.   MANLEY further stated as follows: "what those guys were not expecting was the DOJ case to happen. You know when that happened, that got things shaken up, and all of a sudden the DOJ's records pull and saw in I guess it's in the Pasaca and Innova database Nano Holdings, Clay Manley. So I get a subpoena in the name of Nano Holdings, Clay Manley custodian of records, and I'm like, well, I don't, I'm not a shareholder, I have nothing, I have no part in it. I can't sign this, I can't accept this[.]"[17]

30.   Based on my training and experience and my knowledge of the investigation, I believe that the above-quoted portions of the Recording corroborate the Huang Statement allegation that Huang did not know that ELLIOTT and KASPRZAK operated or were profiting from Nano Holdings.

**M.   KASPRZAK Requested that Communications Regarding Nano Holdings be Addressed to the SUBJECT ACCOUNT**

31.   I and/or members of the Prosecution Team that I have spoken with have reviewed email communications produced by First Republic Bank ("FRB"). Based on my review of these account records, I am aware of the following:

a.   On or about October 2, 2020, roughly two weeks before the first payment from IMG to Nano Holdings, KASPRZAK emailed bankers at FRB, removing his and ELLIOTT's official IMG email accounts from the chain, and substituting the SUBJECT

---

[17] Based on my knowledge of the investigation, I know that a grand jury subpoena was served on Nano Holdings on or about July 7, 2021.

ACCOUNT and his (KASPRZAK's) personal email account. KASPRZAK stated "I'm switching to my personal email address, which i think is more appropriate. I've also now changed Dan's in the recipient list to his personal address. Let's please use these going forward."

      b.    Later the same day, on October 2, 2020, one of the bankers at FRB responded to both KASPRZAK and the SUBJECT ACCOUNT, stating "Understood, Robert. We'll do our best to kill the business address."

## N.    The SUBJECT ACCOUNT Exchanged Emails With Persons Involved with the Alleged Fraud or Nano Holdings

      32.  On or about April 17, 2024, the Honorable Rozella Oliver signed a disclosure order pursuant to 18 U.S. Code § 2703(d) for non-content subscriber information and records for the SUBJECT ACCOUNT, which FDA-OCI SA Bruce Grossnickle served on the Provider.

      33.  The Provider produced responsive documents on or about April 29, 2024 (the "Non-Content Account Records").

      34.  I and/or members of the Prosecution Team that I have spoken with have reviewed the Non-Content Account Records for the SUBJECT ACCOUNT. Based on my review of these records, I am aware of the following:

      a.    The SUBJECT ACCOUNT exchanged at least 185 emails with an email account associated with KASPRZAK (RAK@Kaslaw.net).

      b.    The SUBJECT ACCOUNT exchanged at least 387 emails with Todd Steiner. Based on my knowledge of the investigation and public sources, Todd Steiner is a consulting

chief financial officer for family offices of high net worth individuals.

        c.    The SUBJECT ACCOUNT exchanged at least 34 emails with email addresses associated with "JMBuillon.com." based on publicly-available records, JMBuillon.com is a dealer in precious metals.

        d.    The SUBJECT ACCOUNT exchanged at least 12 emails with email addresses associated with MontanaCorporate.com.

        e.    The SUBJECT ACCOUNT exchanged numerous emails with the email addresses associated with FRB, as noted above.

        f.    The SUBJECT ACCOUNT exchanged numerous emails with the email address Daniel@aol.com.

**O.   I Am Not Aware Of Any Credible Evidence that Huang Knew that ELLIOTT and KASPRZAK Controlled Nano Holdings**

    35.   I understand that, through counsel, ELLIOTT and KASPRZAK have alleged in various forms that Huang agreed to ELLIOTT and KASPRZAK obtaining commissions through Nano Holdings, but that all three agreed to keep this arrangement secret in order to hide these payments from *other* IMG and Pasaca employees. I do not find this explanation credible for the following reasons:

        a.    I have not seen any written agreement documenting this purported authorization by Huang for ELLIOTT and KASPRZAK to receive commissions, and I understand that counsel for ELLIOTT and KASPRZAK allege that this was an oral agreement. In contrast, all other agreements, such as the above-detailed commission agreements, were in writing. Based on my training and

experience, I believe it is unlikely that a multi-million dollar agreement such as ELLIOTT and KASPRZAK allege would not be formalized as part of their employment agreements or in some other written agreement.

      b.   I understand that ELLIOTT and KASPRZAK's counsel have alleged that "[t]here was a January 2021 conversation regarding Nano Holdings between Huang, Elliott and Kasprzak." In addition, counsel for ELLIOTT have provided a portion of a declaration where ELLIOTT apparently stated "in or about September of 2020, I had a discussion with Dr. Huang about paying commissions to me and Mr. Kasprzak. During this discussion. Dr. Huang agreed to the commissions, but requested the basic structure of setting up a separate company for Mr. Kasprzak and me to receive commission payments from Innova so that the commissions would not become public knowledge to other Innova or Pasaca employees and lead them to demand more compensation."

      i.   As detailed above, however, discussions of a "personal arrangement" between MANLEY and ELLIOTT began as early as May of 2020, well before these alleged conversations between Huang and ELLIOTT.

      c.   The above-detailed communications between Huang, ELLIOTT, and KASPRZAK are not consistent with an agreement by Huang to pay ELLIOTT and KASPRZAK commissions. For example, there is no apparent reason to generate the October 8 Letter signed by MANLEY and sent to Huang, stating that a portion of NLT's commissions should be paid to Nano Holdings, if Huang knew

that Nano Holdings was just a vehicle for paying ELLIOTT and KASPRZAK. Similarly, there is no apparent reason for ELLIOTT and KASPRZAK's May 9, 2021 messages discussing concern that Huang would ask questions about ELLIOTT receiving payments at FRB if Huang was previously aware that Nano Holdings was ELLIOTT and KASPRZAK's entity.

d.    I have a reviewed a lawsuit filed by the principles of DNT against ELLIOTT, KASPRZAK, and Huang, which alleges that the principles of DNT were not aware that Nano Holdings was receiving a portion of commission otherwise intended for them.

36.  I have reviewed apparent declarations provided by counsel for ELLIOTT and KASPRZAK, signed by N.K. and K.A.T., in which one or both alleged that they participated in a lunch or dinner with Huang on or about September 12, 2022, and that during this dinner "Huang told me that he created Nano Holdings with Daniel Elliott and Bobby Kasprzak to give commissions to them and other people" and that "At no time during or prior to the dinner did Mr. Huang claim that Daniel Elliott or Bobby Kasprzak misappropriated any money from Innova or Pasaca Capital." I have considered these declarations, but do not believe that they can be credited at this time, for the following reasons:

a.    I have not been able to interview K.A.T., but members of the prosecution team have interviewed N.K., and I have discussed this interview with SA Grossnickle (who was

present) and read an associated Memorandum of Interview, and
N.K. stated as follows:

       i.   N.K. did not draft his declaration, and his
declaration was drafted by counsel for ELLIOTT, and possibly
KASPRZAK. N.K. stated his belief that K.A.T.'s declaration was
similarly drafted by counsel to ELLIOTT and possibly KASPRZAK.

       ii.  During this interview N.K. stated that the
contents of the declaration were true to the best of his
recollection, but admitted that he had at least five or six
drinks during the 90-120 minute lunch, three of which he
described as "doubles" of hard liquor, and that he at times had
difficulty understanding Huang, who he described as speaking in
broken English. When N.K. attempted to recount Huang's exact
words (as N.K. recalled them), they did not match those in the
declaration and were significantly less clear.[18]

       iii. N.K. could not confirm substantial parts of
K.A.T.'s declaration or explain apparent discrepancies between
the documents.

      b.   These declarations also contain factual
allegations which I know to be untrue. For example, each
declaration states that Huang stated that he created Nano
Holdings along with ELLIOTT and KASPRZAK, but multiple

---

[18] During this interview, N.K. stated that he recently
separated from Pasaca, in part because he believed Huang was
involved in multiple incidents of sexual harassment or similar
misconduct, and that Huang had not been honest about these
matters. I have not been able to substantiate these allegations,
but note that this purported separation only occurred after N.K.
was approached by investigating agents, and that N.K. admitted
that he understood his legal fees would be paid by ELLIOTT.

contemporaneous documents show that Huang did not create Nano Holdings and never held any interest in Nano Holdings.

    c.    Both N.K. and K.A.T. each received substantial payments from ELLIOTT; specifically, on or about April 9, 2021, a wire transfer of $1,000,000 was made from an entity ELLIOTT controlled, "Fastdew Inc.," into N.K.'s bank account,[19] and on or about September 23, 2022, K.A.T. received a wire for $2.8 million from another of ELLIOTT's entities, "Phoenix Genesis."[20]

    d.    I have reviewed other documents signed by K.A.T. at the request of ELLIOTT, where N.K. acted as an intermediary, which I believe to be fraudulent. Specifically, on or about September 14, 2020, K.A.T. signed a letter addressed to ELLIOTT (the "K.A.T. Letter"), which both K.A.T. and N.K. would have expected ELLIOTT would submit to the UK DHSC. In the K.A.T. Letter, K.A.T. represented that he was "a major holder in Pasaca Capital" and "maintains holdings in Pasaca that are directed towards lnnova Medical Group, Inc. for heart disease and cancer related equity holdings of substantial 9 figure equity investments." Based on my knowledge of the investigation, the K.A.T. Letter was false, in that K.A.T. never made any nine-figure investment into Pasaca, rather, K.A.T. had earlier assigned an interest in a bankrupt biotechnology investment to

---

[19] N.K. stated that this was a loan from ELLIOTT to purchase a collectible car as an investment, which was not a success. I have been unable to confirm this explanation at this time.

[20] N.K. described this payment to K.A.T. from ELLIOTT as a bridge loan or possibly a penalty for another investment. I have not been able to substantiate this explanation.

Pasaca in exchange for payment of legal fees.[21] I have seen no evidence that this assignment was valued near a "substantial 9 figure" amount.

37. Other than what has been described herein, to my knowledge the government has not attempted to obtain the contents of the SUBJECT ACCOUNT by other means.

## IV.  TRAINING AND EXPERIENCE ON FRAUD CRIMES

38. Based on my training and experience and information obtained from other law enforcement officers who investigate fraud crimes, I know the following:

a.  Based on my training and experience, I know that individuals who participate in fraud schemes often have co-conspirators, and often maintain electronic messages, telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital accounts. Suspects often use digital services to communicate with co-conspirators by email, text, and social media, including sending photos.

b.  It is common practice for individuals involved in fraud crimes to possess and use multiple digital accounts at once, or alternately, for multiple suspects to share certain pseudonymous accounts. Such digital accounts are often used to facilitate, conduct, and track fraudulent transactions. Suspects

---

[21] Counsel for Huang has also confirmed that these statements by K.A.T. in this September 14, 2020 letter were not correct, and that K.A.T. was never a major holder or investor in Pasaca.

often use or share access to multiple accounts to perpetrate
their crimes due to the relative anonymity gained by conducting
financial transactions and communications electronically or over
the internet.  It is also common for suspects to share access to
digital accounts for the purposes of impersonation or
communication, such as by communication through drafts or notes
maintained in a digital account.

       c.   It is common for individuals engaged in fraud
crimes to use equipment and software to create false documents.
Software relevant to such schemes can often be found on digital
devices, such as computers. It is also common individuals
engaged in fraud and impersonation crimes to seek out equipment
or vendors for the creation of physical false identification
materials, which may include electronic searches and
communications.

       **V.   BACKGROUND ON E-MAIL ACCOUNTS AND THE PROVIDER**

   39.   In my training and experience, I have learned that
providers of e-mail services offer a variety of online services
to the public. Providers, like the PROVIDER, allow subscribers
to obtain accounts like the SUBJECT ACCOUNT. Subscribers obtain
an account by registering with the provider. During the
registration process, providers generally ask their subscribers
to provide certain personal identifying information when
registering for an e-mail or social media account. Such
information can include the subscriber's full name, physical
address, telephone numbers and other identifiers, alternative
e-mail addresses, and, for paying subscribers, means and source

of payment (including any credit or bank account number). Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

40.   Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNT.

41.   A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER.

42.   In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session)

times and durations, the types of service utilized, the status
of the account (including whether the account is inactive or
closed), the methods used to connect to the account (such as
logging into the account via the provider's website), and other
log files that reflect usage of the account. In addition, e-mail
and social media providers often have records of the Internet
Protocol ("IP") address used to register the account and the IP
addresses associated with particular logins to the account.
Because every device that connects to the Internet must use an
IP address, IP address information can help to identify which
computers or other devices were used to access the SUBJECT
ACCOUNT.

43. In my training and experience, e-mail and social media
account users will sometimes communicate directly with the
service provider about issues relating to the account, such as
technical problems, billing inquiries, or complaints from other
users. Providers of e-mails and social media services typically
retain records about such communications, including records of
contacts between the user and the provider's support services,
as well records of any actions taken by the provider or user as
a result of the communications. In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of the SUBJECT ACCOUNT.

44. In my training and experience, the complete contents
of an account may be important to establishing the actual user
who has dominion and control of that account at a given time.

36

Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of the SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with the SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

        45.  Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNT. If

the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

46.   I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime
involved. In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept
or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters. "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures
set forth in Attachment B, is necessary to find all relevant
evidence within the account.

47.   This application seeks a warrant to search all
responsive records and information under the control of the
PROVIDER, which is subject to the jurisdiction of this court,

regardless of where the PROVIDER has chosen to store such information.

48. As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a. I make that request because I believe it might be impossible for a provider to authenticate information taken from the SUBJECT ACCOUNT as its business record without the original production to examine. Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from the SUBJECT ACCOUNT.

b. I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers. For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted. As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example,

39

if a defendant is incarcerated and does not (perhaps cannot) access his or her account. Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VI.  REQUEST FOR NON-DISCLOSURE

49.  Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in: (1) destruction of or tampering with evidence; or (2) intimidation of potential witnesses, otherwise seriously jeopardizing the investigation. While parts of the current investigation set forth above have been publicly reported, not all of the above information is public knowledge, and I know, based on my training and experience, that individuals engaged in fraud often will destroy digital evidence if they learn of an investigation. In addition, if the target learns of the investigation, that will jeopardize the ability for investigators to seek to obtain statements from the target

regarding the offense conduct including through the use of cooperating informants.

## VII. __CONCLUSION__

50.   Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

BRAD CHESTER
_____
Brad Chester, Special Agent
Food & Drug Administration

Subscribed to and sworn by telephone
on June 12, 2024.


_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE